# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Personal Restraint of: | No. 59909-1-II |
| BRANDON W. HARM, | UNPUBLISHED OPINION |
| Petitioner. | |

PRICE, J. — In this timely personal restraint petition (PRP)[1], Brandon W. Harm seeks relief from personal restraint following his conviction for second degree assault—domestic violence (DV) with sexual motivation. Harm alleges that he received ineffective assistance of counsel when his defense counsel failed to introduce impeaching text messages between Harm and the victim. We disagree and deny Harm's PRP.

## FACTS

In October 2019, Harm and a woman, A.J., began communicating on an online dating site. *State v. Harm*, No. 58001-2-II, slip op. at 1 (Wash. Ct. App. Oct. 1, 2024) (unpublished).[2] After several days, A.J. went to Harm's house to see him. *Id.* at 2. A.J. alleged that when she was leaving, Harm walked with her to her car and the two began hugging and kissing. *Id.* Then, Harm

---

[1] Harm's judgment and sentence became final on November 20, 2024, when this court issued the mandate following his direct appeal. RCW 10.73.090(3)(b). This petition was originally filed as a CrR 7.8 motion in the trial court on July 15, 2024.

[2] https://www.courts.wa.gov/opinions/pdf/D2%2058001-2-II%20Unpublished%20Opinion.pdf

strangled her.  *Id.*  The State charged Harm with second degree assault—DV with sexual

motivation.  *Id.*

At a jury trial, A.J. testified to the details of the incident with Harm.  *Id.* at 3-4.  After A.J.

described being strangled by Harm, the prosecutor asked whether A.J. had consented to it:

> [STATE:]  I'm gonna ask you some questions and I apologize for having to—to get into these situation[s].  But was this something that was expected or not expected?
>
> [A.J.:] I didn't expect that at all.
>
> [STATE:] Was it something that—
>
> [A.J.:] There was nothing that led up to this that made sense to me in my mind.  I questioned myself every day, cause I don't know what I did to make him do that to me.
>
> [STATE:] Had you consented or told him it was okay to do that?
>
> [A.J.:] Never did I say anything that would instigate [sic] or say that was okay.  We never had a conversation.  I was never asked if that [was] something I wanted to do.
>
> [STATE:] Is that something that you wanted to do at that point?
>
> [A.J.:] No.

Verbatim Rep. of Proc. (VRP) at 172.  A.J. further testified that she and Harm had not previously

had any "discussion of intercourse."  VRP at 167-68.

Harm also testified at the trial.  *Harm*, slip op. at 6-7.  Harm denied strangling A.J.

*Id.* at 7.  At closing argument, defense counsel reiterated Harm's denial and also argued that the

State had not proven that Harm and A.J. were in an intimate partner relationship.

The jury found Harm guilty of second degree assault—DV with sexual motivation.  *Id.*

Harm appealed and this court affirmed his convictions.[3]  *Id.* at 17.

---

[3] This court did remand to strike the $500 victim penalty assessment from Harm's judgment and sentence.  *Harm*, slip op. at 17.

While Harm's appeal was pending, Harm filed a CrR 7.8 motion alleging he received ineffective assistance of counsel because his counsel failed to introduce text messages between Harm and A.J.

The text messages came from an exchange that occurred around 1 a.m. on October 5, approximately 12 hours before A.J. went to Harm's house. The text messages, as a whole, were generally flirtatious and contained references to kissing and making out. At one point, Harm texted A.J., "Honey, I hope that apart of my true self doesn't scare you away lololol," and told A.J. that he was "into BDSM lifestyles."[4] PRP, Ex. at 16. Harm then sent A.J. two pictures, one of a naked woman laying on her back wearing something akin to a bodice or corset constructed with a rope tied into a series of knots, and another of a naked woman being spanked by what appears to be a man in a business suit. A.J. responded in a text, which said, "Me af" and "I need a daddy." PRP, Ex. at 17. Harm replied that he would be her "daddy" and then said, "Doesn't have to happen anytime soon, don't wanna rush our dynamic." PRP, Ex. at 17.

The superior court transferred Harm's CrR 7.8 motion to this court for consideration as a PRP. Harm (through counsel) filed a supplemental brief in support of his PRP, which included a declaration from Harm's trial counsel that addressed the text messages and his decision to not use them during trial.

Trial counsel declared that he conducted an investigation into the charges against Harm and met with Harm a substantial number of times. During these meetings, Harm told defense counsel that he did not strangle A.J. Defense counsel also stated that he reviewed the text messages

---

[4] BDSM is an acronym for bondage, dominance, submission, and masochism. *See Harm*, slip op. at 3.

between Harm and A.J. Based on the text messages, defense counsel concluded that "it appeared that A.J. was open to the idea of having a non-traditional sexual relationship with Mr. Harm." Pet.'s Suppl. Br., Ex. 1 at 3. But defense counsel "was unsure of a consent strategy because [counsel] did not believe a jury would acquit Mr. Harm if he both denied choking and strangling A.J. yet simultaneously claimed she consented to some type of BDSM relationship with the implication that there was consent to some type of choking or strangling." Pet.'s Suppl. Br., Ex. 1 at 5-6. Therefore, defense counsel decided to pursue a general denial strategy because introducing BDSM into the trial could prejudice Harm and because the text messages could also prove that Harm was in an intimate partner relationship with A.J. Further, there was security footage from Harm's house that did not show any strangulation occurring.

Defense counsel also said that he did not consider using the text messages to impeach A.J.'s testimony. During A.J.'s testimony, defense counsel recognized that A.J. "was not telling the truth," but defense counsel,

> did not realize at the time that the text messages directly contradicted her testimony that she did not previously discuss sex with Mr. Harm, or the BDSM lifestyle. In part, this was due to the limited amount of text messages referring to BDSM.

Pet.'s Suppl. Br., Ex. 1, at 6-7.

## ANALYSIS

Harm alleges that he received ineffective assistance of counsel when counsel failed to impeach A.J.'s trial testimony with her text messages. But Harm has failed to show that defense counsel's performance was deficient. Accordingly, we deny Harm's PRP.

A PRP is a mechanism used to seek relief from unlawful restraint. RAP 16.4(a)-(c). To obtain relief in a PRP, the petitioner must establish, by a preponderance of the evidence, either a

constitutional error that has resulted in actual and substantial prejudice or a nonconstitutional error that constitutes a fundamental defect resulting in a complete miscarriage of justice. *In re Pers. Restraint of Dove*, 196 Wn. App. 148, 154, 381 P.3d 1280 (2016), *review denied*, 188 Wn.2d 1008 (2017). "Factual evidence, rather than conclusory allegations, must be offered in support of a PRP." *In re Pers. Restraint of Williams*, 198 Wn.2d 342, 352, 496 P.3d 289 (2021); RAP 16.7(a)(2)(i).

Both the United States Constitution and the Washington Constitution guarantee the right to effective assistance of counsel. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. In the context of a PRP alleging ineffective assistance of counsel, a petitioner who demonstrates ineffective assistance of counsel necessarily shows actual and substantial prejudice. *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 843, 280 P.3d 1102 (2012).

To prevail on an ineffective assistance of counsel claim, the petitioner must show (1) that counsel's performance was deficient and (2) the deficient performance resulted in prejudice. *State v. Bertrand*, 3 Wn.3d 116, 128, 546 P.3d 1020 (2024). An ineffective assistance of counsel claim fails if the petitioner fails to satisfy either prong of the inquiry. *Crace*, 174 Wn.2d at 847. We need not consider both prongs if the petitioner fails to satisfy one. *Id.*

"Performance is deficient if 'it [falls] below an objective standard of reasonableness.' " *Bertrand*, 3 Wn.2d at 128 (alteration in original) (quoting *State v. McFarland*, 127 Wn.2d 322, 334, 899 P.2d 1251 (1995)). We engage in a strong presumption that counsel's performance was reasonable. *Id.* "Defense counsel's performance is not deficient if it is a 'legitimate trial strategy or tactic[].' " *Id.* (alteration in original) (quoting *State v. Kyllo*, 166 Wn.2d 856, 863, 215 P.3d

177 (2009)). The relevant question is whether defense counsel's strategic choices were reasonable. *State v. Vazquez*, 198 Wn.2d 239, 255, 494 P.3d 424 (2021).

Cross-examination is entrusted to the professional discretion of counsel. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 720, 101 P.3d 1 (2004). Courts need not determine trial counsel's reasons for not cross-examining witnesses, if counsel's approach is within the range of reasonable representation. *Id.* "[E]ven a lame cross-examination will seldom, if ever, amount to a Sixth Amendment violation." *In re Pers. Restraint of Pirtle*, 136 Wn.2d 467, 489, 965 P.2d 593 (1998).

Harm alleges it was unreasonable for defense counsel to fail to impeach A.J. with her text messages because the text messages directly contradicted her trial testimony. We disagree. Assuming, without deciding, that the trial court would have admitted the text messages for the impeachment of A.J., it was not unreasonable for defense counsel to fail to do so.

First, Harm alleges the text messages directly contradict A.J.'s testimony that she and Harm did not discuss sexual intercourse. While the text messages may reference or allude to sexual topics, including BDSM, there are no text messages that explicitly discuss engaging in sex. Thus, nothing in the text messages directly contradicts A.J.'s testimony that she and Harm did not discuss sexual intercourse.

Second, Harm contends that the text messages directly contradict A.J.'s testimony that she had no idea why the incident occurred. As noted above, A.J. testified that

> [t]here was nothing that led up to this that made sense *to me in my mind*. I questioned myself every day, cause I don't know what I did to make him do that to me.
>
> . . . .

> Never did I say anything that would instigate [sic] or say that was okay. We never had a conversation. I was never asked if that [was] something I wanted to do.

VRP at 172 (emphasis added). Although the text messages between A.J. and Harm include a brief discussion of BDSM, to which A.J. arguably expressed openness, there was no discussion of engaging in strangulation. And neither image included in Harm's texts included a depiction of strangulation. Further, even in response to A.J.'s potential openness to BDSM, Harm responded that nothing had to happen any time soon and he did not want to rush the dynamic. Viewed in context, it is reasonable to conclude that nothing in the text conversation indicated *to A.J.* that she had either established a BDSM relationship with Harm or that she was consenting to being strangled in her car. Therefore, the text messages not only fail to directly contradict A.J.'s testimony, but they could be viewed as consistent with A.J.'s testimony.

Because the text messages did not directly contradict A.J.'s testimony, it was reasonable for defense counsel to not view the text messages as potentially impeaching of A.J. As defense counsel recognized, the impeachment value of the text messages was not readily apparent because of the minimal references to BDSM in the text messages. Further, defense counsel recognized that there was the potential for the text messages to cause more prejudice to Harm and undermine his defense strategy, including his denial of strangulation and his claim that an intimate partner relationship was not proven. Given the limited impeachment value of the text messages and the recognized potential for prejudice, the strategic choice of defense counsel to not use the text messages to impeach A.J. was reasonable.[5] Thus, Harm has failed to establish that defense

---

[5] Beyond his argument about the impeachment of A.J. with the text messages, Harm appears to separately contend that defense counsel was ineffective because he unreasonably chose a defense

counsel's performance was deficient. Without a showing of deficient performance, Harm's ineffective assistance of counsel claim must fail. We deny Harm's PRP.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

CRUSER, C.J.

VELJACIC, J.

---

of general denial over consent when the text messages could have been used to prove consent. This claim lacks any factual basis. Although Harm now "recants" his testimony and admits that he *did* "grab" A.J.'s neck, not only did Harm tell defense counsel before trial that he did not strangle A.J., he clearly testified at trial that he did *not* strangle A.J. PRP at 15. Based on Harm's flat denial, it was not unreasonable for defense counsel to continue to pursue a general denial strategy at trial, notwithstanding the existence of the text messages. *See Strickland v. Washington*, 466 U.S. 668, 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").